## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KENNETH L. EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-749-CFC-SRF |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

## I.      INTRODUCTION

Plaintiff Kenneth L. Evans ("Evans") filed this action on August 25, 2016 against the

defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration

(the "Commissioner"). Evans seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's final decision denying Evans' claim for disability insurance benefits ("DIB")

and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the

"Act"), respectively. 42 U.S.C. §§ 401–434 and §§ 1381–1383f. The court has jurisdiction over

the matter pursuant to 42 U.S.C. § 405(g).

Before the court are cross-motions for summary judgment filed by Evans and the

Commissioner. (D.I. 14; D.I. 17) Evans asks the court to reverse the Commissioner's decision

and remand with instructions to award benefits or, alternatively, to remand his case for further

administrative proceedings. (D.I. 15 at 2) The Commissioner requests the court affirm the

decision of the administrative law judge ("ALJ"). (D.I. 18 at 19) For the reasons set forth

below, the court recommends denying Evans' motion for summary judgment (D.I. 14), and

granting the Commissioner's cross-motion for summary judgment (D.I. 17).

## II. BACKGROUND

### A. Procedural History

Evans filed claims for DIB and SSI on February 27, 2012 and May 11, 2012, respectively, claiming a disability onset date of December 12, 2008. (D.I. 10-5 at 2-12; D.I. 10-6 at 2) His claim was initially denied on June 20, 2012, and denied again after reconsideration on March 11, 2013. (D.I. 10-4 at 2-6, 11-16) Evans then filed a request for a hearing, which was held on September 15, 2014. (D.I. 10-2 at 41-73; D.I. 10-4 at 17-22) At the hearing, Evans amended his alleged disability onset date to August 19, 2013. (D.I. 10-2 at 45) On December 10, 2014, ALJ Stanley J. Petraschuk issued an unfavorable decision, finding that Evans was not disabled under the Act. (*Id.* at 20-35) The Appeals Council subsequently denied Evans' request for review on June 23, 2016, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 2-4) On August 25, 2016, Evans brought a civil action in this court challenging the ALJ's decision. (D.I. 2) On May 22, 2017, Evans filed a motion for summary judgment, and on July 20, 2017, the Commissioner filed a cross-motion for summary judgment. (D.I. 14; D.I. 17)

### B. Medical History[1]

Evans was born on October 3, 1963. (D.I. 10-2 at 2) He was forty-eight years old when he applied for benefits in May 2012, and he was fifty-one years old when the ALJ rendered a decision on his applications for benefits. (*Id.*; D.I. 10-2 at 33; D.I. 10-3 at 13) Evans graduated high school and worked as a pipefitter from 1987 to 2008. (D.I. 10-6 at 5, 22-23) The ALJ found Evans has the following severe impairments: alcohol dependence, depression, neuropathy,

---

[1] Evans challenges the ALJ's analysis of his physical impairments, but he raises no objections to the ALJ's analysis of his mental impairments. (D.I. 15) Therefore, the court does not summarize the medical evidence regarding Evans' mental impairments.

and chronic obstructive pulmonary disease ("COPD"). (D.I. 10-2 at 25) The amended onset date of Evans' impairments is August 19, 2013. (*Id.* at 23)

Prior to his amended onset date of August 19, 2013, Evans had a history of alcohol abuse, COPD with asthma, hypertension, hyperlipidemia, bilateral foot pain, alcoholic neuropathy, renal failure, and a Dupuytren's contracture in his right hand. (D.I. 10-9 at 35-38, 51-56; D.I. 10-11 at 68-73, 91-93; D.I. 10-12 at 2-4, 45, 65-70) In June 2012, Dr. Robert Palandjian, a state agency medical consultant, reviewed Evans' medical records and completed a physical residual functional capacity ("RFC") assessment. (D.I. 10-3 at 7-9) Dr. Palandjian opined that Evans could lift twenty pounds occasionally, ten pounds frequently, stand and/or walk about six hours in an eight-hour workday, and sit for more than six hours. (*Id.* at 8) Dr. Palandjian also described some postural and environmental limitations due to Evans' impairments, including climbing ladders, ropes, and scaffolds. (*Id.*)

On August 19, 2013, Evans sustained injuries to his neck, right shoulder, and back in a car accident. (D.I. 10-14 at 24-29, 49; D.I. 10-15 at 40) An x-ray of Evans' cervical spine taken in August 2013 showed significant degenerative changes at the C6 to C7 level with no neural foraminal narrowing. (D.I. 10-14 at 29) On August 27, 2013, Evans was evaluated at the Veterans Administration Medical Center ("VAMC") by Dr. Reema Malhotra for balance problems following multiple falls. (D.I. 10-15 at 46-47) Dr. Malhotra observed that Evans' gait was slow and antalgic, and she prescribed a cane to support his balance. (*Id.* at 43, 46-47) Evans reported nerve damage in his feet with impaired sensation to light touch, but he declined the use of orthotic metatarsal pads because he did not have tennis shoes. (*Id.* at 46)

An MRI of Evans' cervical spine on October 18, 2013 revealed multilevel degenerative changes of the cervical spine at the C5-6 and C6-7 levels, with canal stenosis and neural

foraminal narrowing. (D.I. 10-14 at 31) Beginning in October 2013, Evans attended physical

therapy to improve his balance and address weakness in his bilateral lower extremities. (D.I. 10-

15 at 33-42) The physical therapist prescribed a grab bar and shower chair for Evans' bathroom.

(*Id.* at 33, 41) Evans discontinued physical therapy in December 2013 after he fell and broke his

ribs. (*Id.* at 33)

Beginning in September 2013, Evans was also treated for neck and back pain by Arnold

Glassman, D.O., a physical medicine and rehabilitation specialist at Delaware Back Pain and

Sports Rehabilitation. (D.I. 10-17) Dr. Glassman observed tenderness and a reduced range of

motion in Evans' cervical, thoracic, and lumbar spine; an abnormal gait;[2] and impaired sensation

in the bilateral extremities. (D.I. 10-18 at 11-12) Dr. Glassman diagnosed Evans with

cervicothoracic and lumbosacral spine pain and a history of neuropathy not related to the motor

vehicle accident. (*Id.* at 12) He prescribed Percocet and formal therapy with a goal of

decreasing pain and increasing Evans' range of motion. (*Id.* at 12-13)

From November 2013 through August 2014, Dr. Glassman continued to treat Evans for

neck, back, right shoulder, and right wrist pain. (D.I. 10-17 at 3-75; D.I. 10-18 at 2-9) In

November 2013, Evans underwent an MRI of his right shoulder, which showed tendinitis and a

tear in his rotator cuff. (D.I. 10-14 at 36) Evans also had an EMG of his right upper extremity,

which revealed carpal tunnel syndrome in his right wrist. (*Id.* at 57-58) Dr. Glassman noted that

Evans had some limited range of motion in his spine and right shoulder, decreased sensation in

his lower extremities, and positive Tinel's sign over his right wrist. (D.I. 10-17 at 10, 15, 20-21,

_____

[2] Dr. Glassman observed Evans' abnormal gait and use of a cane in treatment notes from
September 2013 through February 2014. (D.I. 10-17 at 48, 53, 58, 62-63, 69, 75; D.I. 10-18 at 6,
11) From March 2014 through August 2014, Dr. Glassman's treatment notes reflect that Evans
walked with a normal gait and did not use a cane. (D.I. 10-17 at 5, 10, 15, 21, 25, 37, 42)

4

25-27, 36-37, 42-43, 48, 52-53, 68-69, 74-75) However, Evans had a full range of motion in his right hand. (*Id.* at 5, 10, 15, 20, 25, 36, 42, 48, 52, 65) Dr. Glassman prescribed Percocet and osteopathic manipulation. (*Id.* at 6-8, 11-12, 16, 21, 26, 37, 43) Evans declined orthopedic surgical intervention for his right shoulder or right wrist throughout his treatment with Dr. Glassman, and he reported only rare occasions of right wrist pain during his August 2014 visit. (*Id.* at 3, 8, 13, 16, 58, 63, 66)

Evans consulted with Peter F. Townsend, M.D., an orthopedic surgeon, regarding his right shoulder, wrist, and finger pain in January 2014. (D.I. 10-14 at 49) Evans reported that his right shoulder pain did not improve with physical therapy. (*Id.*) Dr. Townsend diagnosed Evans with bursitis and tendinitis of the rotator cuff, and he noted that Evans' range of motion was mildly limited. (*Id.*) Dr. Townsend administered an injection to Evans' right shoulder. (*Id.*)

In March 2014, Evans saw Dr. Townsend for a finger contracture and for pain, numbness, and tingling in his right hand. (*Id.* at 48) Evans had a positive Tinel's sign at the wrist flexion crease and a positive Phalen's test, and his right ring finger had a 35 degree contracture. (*Id.*) Dr. Townsend recommended night splints and an additional EMG, which revealed median nerve entrapment neuropathy at the wrist, consistent with mild right carpal tunnel syndrome. (*Id.* at 48, 54) Dr. Townsend noted that Evans had "a full range of motion of the shoulder, elbow, wrist and fingers." (*Id.* at 48)

Evans continued to treat at the VAMC. A pulmonary function diagnostic test in January 2014 showed moderate obstructive airway disease with significant bronchodilator response. (D.I. 10-15 at 25) During a visit on February 8, 2014, Evans smelled of alcohol and reported tobacco use and shortness of breath with light activity. (*Id.* at 14) He was diagnosed with worsening COPD, but his back pain was listed as "resolved." (*Id.* at 15) A subsequent

5

pulmonary examination in May 2014 revealed that Evans' lung capacity was reduced, but clear when examined with a stethoscope. (*Id.* at 3-4) He was diagnosed with mild COPD and asthma. (*Id.* at 4) Evans' prescribed inhalers were modified accordingly. (*Id.* at 4-5)

In September 2014, Dr. Glassman completed a Lumbar Spine Medical Source Statement, listing Evans' diagnoses to include cervical/thoracic/lumbar strain and sprain, carpal tunnel syndrome, shoulder impingement syndrome, and peripheral neuropathy. (D.I. 10-18 a 50) Dr. Glassman identified a reduced range of motion in Evans' neck, low back, and right shoulder. (*Id.* at 51) As a result of these impairments, Dr. Glassman opined that Evans could stand or walk less than two hours a day, and sit two to four hours a day, with breaks every one to two hours lasting between three and five minutes. (*Id.* at 51-52) According to Dr. Glassman, Evans could lift less than ten pounds occasionally and ten pounds rarely, could never crouch, squat, or climb ladders, and could rarely twist, stoop, and bend. (*Id.*) Dr. Glassman indicated that Evans would have to shift positions at will, walk around every thirty minutes, take unscheduled breaks, elevate his legs with prolonged sitting, and use a cane for standing or walking. (*Id.*) Dr. Glassman noted no restrictions on Evans' use of his hands for grasping, fine manipulation, and reaching in front of his body, but explained that Evans could only reach overhead with his right arm for 50% of the work day. (*Id.* at 52-53) Dr. Glassman predicted that Evans' impairments would cause him to be absent from work about three days per month, and would cause him to be off task 20% or more of the work day. (*Id.* at 53)

## C. Hearing Before the ALJ

### 1. Evans' testimony

Evans testified that he experiences neuropathy in his legs due to damage in the muscles caused by his kidney failure. (D.I. 10-2 at 52) According to Evans, this condition causes him

constant pain from his hips to his feet that causes his legs to give out. (*Id.* at 52-53) Evans testified that the pain in his legs affects his ability to walk without a cane and stand in the shower. (*Id.*) Despite taking nerve blockers to reduce the pain, Evans testified that he still experiences pain. (*Id.* at 53-54) Consequently, Evans reported that he can only walk for a couple of blocks before his legs start hurting and he runs out of breath, and he cannot stand for more than a half hour without pain. (*Id.* at 60-61)

Evans explained that he also has problems with nodules forming in his right hand, preventing him from straightening his thumb and two middle fingers or picking up small objects. (*Id.* at 54) He stated that the carpal tunnel syndrome in his right hand causes constant numbness in his fingers and down the side of his hand. (*Id.* at 54-55)

Evans reported that he was diagnosed with cervical strain and sprain in his neck, which makes it difficult to move his head from side to side. (*Id.* at 55-56) Evans described having constant soreness in his lower back and stabbing pain in his middle back. (*Id.*) In addition, Evans explained that his torn rotator cuff causes him pain in his right shoulder when he reaches above his head. (*Id.* at 57)

Evans stated that he suffers from depression, and his medication makes it difficult to concentrate. (*Id.* at 58-59) Evans testified as to his history with alcohol abuse. (*Id.* at 60) At the time of the hearing, Evans stated that he had not consumed alcohol for four months following his diagnosis with cirrhosis. (*Id.*)

Evans lives with his girlfriend, who performs all the chores. (*Id.* at 64) Evans testified that he is no longer able to wash dishes due to his hand condition, and he cannot vacuum because the dust makes it difficult for him to breathe. (*Id.*) Evans is able to attend church services, but

7

he does not participate in other social activities. (*Id.* at 64-65) Evans reported that he is able to care for his personal hygiene. (*Id.* at 65)

## 2. Vocational expert testimony before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

> And if you could please assume a hypothetical individual of the claimant's age, education and work history who can perform at the light exertional level; who can frequently climb ramps and stairs; who can never climb ladders, ropes and scaffolds; who can frequently balance, stoop, kneel, crouch and crawl; who must avoid concentrated exposure to extreme cold and extreme noise – excuse me, extreme cold, extreme heat, noise, vibration, fumes, odors, dusts, gases, poor ventilation; who must avoid all exposure to hazards such as machinery and heights; who can frequently interact appropriately with the general public; who can ask simple questions or request assistance. Would there be any jobs available?

(*Id.* at 69) The VE testified that at the light, unskilled level, the individual described would be able to work in occupations including router, inspector, and pre-assembler for printed circuit boards, but would not be able to perform past work. (*Id.*)

The ALJ then posed the following to the VE:

> If we could pick it up where we would leave off, where we began, who can frequently interact appropriately with the general public, if we could switch to who can understand simple, primarily oral instructions; who has an impairment which affects, but does not preclude an ability to function and sustaining work performance and attendance in a normal work setting, coping with pressures of ordinary work, for instance, meeting quality and production quotas. Would there be any jobs there?

(*Id.* at 69-70) The VE testified that there would no longer be work if those limitations interfere with productivity, and productivity drops more than 15 to 20 percent. (*Id.* at 70)

On cross examination, Evans' attorney asked whether there would be available work for a hypothetical individual who is limited to

> standing and walking less than two hours; sitting about two to four hours; would need unscheduled breaks every one to two hours, lasting between three to five minutes; would need to elevate their legs at waist level about 50 percent of the

8

workday; would need to use a cane for engaging in occasional standing and
walking; would be limited to occasionally lifting less than ten pounds; rarely
twist, rarely stoop; never crouch, never climb ladders; occasionally climb stairs.
For reaching, handling and fingering in an eight-hour workday the restriction
would be with the right arm, would be limited to 50 percent for overhead
reaching. The person would be off task 20 percent of the typical workday, that it
would be interfering with attention and concentration; would have good and bad
days and would be absent about three days per month.

(*Id.* at 70-71) The VE stated that there would be no work for that individual on a full-time,

sustained basis due to the limitations on sitting, standing and walking; elevating of the leg to

waist level for half the day; missing three or more days per month; and being off task 20 percent

of the day. (*Id.* at 71-72)

## D. The ALJ's findings

Based on the factual evidence in the record and the testimony of Evans and the VE, the

ALJ determined that Evans was not disabled under the Act for the relevant time period from

August 19, 2013 through the date of the ALJ's decision on December 10, 2014. (D.I. 10-2 at 23-

35) The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act
   through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since August 19,
   2013, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971
   *et seq.*).

3. The claimant has the following severe impairments: alcohol dependence,
   depression, neuropathy, and chronic obstructive pulmonary disease (20 CFR
   404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that
   meets or medically equals the severity of one of the listed impairments in 20
   CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
   404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the
   residual functional capacity to perform light work as defined in 20 CFR
   404.1567(b) and 416.967(b) except he can frequently climb ramps and stairs

9

and never climb ladders, ropes, or scaffolds; he can frequently balance, stoop, kneel, crouch, and crawl; he can have no concentrated exposure to extreme cold, extreme heat, noise, vibration, fumes, odors, dusts, gases, and poor ventilation, and no exposure to hazards such as machinery and heights; he can frequently interact appropriately with the general public, ask simple questions, and request assistance; and he is limited to simple, routine work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 3, 1963 and was 49 years old, which is defined as a younger individual age 18-49, on the amended disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 19, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(D.I. 10-2 at 25-34)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if

they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015).

---

[3] The VE testified that at the light, unskilled level, Evans would be able to work in occupations including router, with over 76,000 positions nationally; inspector, with over 58,000 positions nationally; and pre-assembler for printed circuit boards, with over 285,000 positions nationally. (D.I. 10-2 at 69)

Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190–91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the United States Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250–51 (internal citations omitted). Thus, in the context of judicial review under § 405(g):

11

[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 826 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." 42 U.S.C. § 423(a)(1)(D) (2015); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant

12

is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *Id.* § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21–22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. 20 C.F.R. § 404.131 (2016); *Matullo v. Bowen,* 826 F.2d 240, 244 (3d Cir. 1990).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel,* 186 F.3d 422, 427–28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer,* 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

13

At step four, the ALJ considers whether the claimant retains the residual functional capacity (the "RFC") to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

**B.    Whether the ALJ's Decision is Supported by Substantial Evidence**

On December 10, 2014, the ALJ found Evans was not disabled within the meaning of the Act from the amended alleged onset date of August 19, 2013, through the date of the decision. (D.I. 10-2 at 34) The ALJ concluded that, despite Evans' severe impairments (alcohol dependence, depression, neuropathy, and COPD), he had the residual functional capacity to

14

perform limited light work[4] and perform jobs that exist in significant numbers in the national economy. (*Id.* at 28-34) The ALJ further concluded that Evans could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but he could never climb ladders, ropes, or scaffolds and could have no concentrated exposure to extreme cold, extreme heat, noise, vibration, fumes, odors, dusts, gases, poor ventilation, or hazards such as machinery and heights. (*Id.* at 28) After considering the VE's testimony, the ALJ found that Evans could not return to his past relevant work as a pipefitter. (*Id.* at 33) However, the VE testified that Evans could work as a router, inspector, and pre-assembler. (*Id.* at 34)

Evans asserts three main arguments on appeal: (1) the ALJ erred in his severity findings of Evans' impairments, (2) the ALJ erred in his determination of Evans' RFC, and (3) the ALJ erred as a matter of law in failing to accord adequate weight to the opinion and assessment of Evans' treating physician, Dr. Glassman. (D.I. 15 at 12-20)

### 1. Severity findings

Evans contends that the ALJ erred at step two of the analysis in finding that his spinal conditions, carpal tunnel syndrome, and partial tear in the tendon of his right rotator cuff were not severe impairments. (D.I. 15 at 12) In addition, Evans contends that the ALJ erred in failing to consider his right hand contracture, which was a separate impairment from his right carpal tunnel syndrome. (*Id.*) Evans noted that the ALJ relied upon the opinions of state agency consultants who last evaluated Evans prior to the car accident and Evans' amended disability

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

15

onset date, even though these state agency consultants did not have the benefit of evaluating Dr. Glassman's records. (*Id.* at 15)

Evans bears the burden of demonstrating that an impairment is "severe." *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). To satisfy the standard, Evans must show that the impairment is more than "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Social Security Ruling 85-28, 1985 WL 56856, at \*3. An impairment is not severe if it "amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); 20 C.F.R. §§ 404.1520(c) and 416.920(c).

The ALJ did not err in finding that Evans' shoulder, neck, back, and carpal tunnel syndrome were not severe impairments. The ALJ determined that these impairments were not severe because the record did not establish that these impairments "impose[d] any significant restrictions on his ability to perform basic work activities." (D.I. 10-2 at 26) The medical evidence supports the ALJ's conclusion. Treatment records show that Evans received physical therapy, osteopathic manipulation, and chiropractic care for the conditions in his legs, neck, back, shoulder, and wrist. (D.I. 10-15 at 33, 40-42; D.I. 10-17 at 6, 18, 26; D.I. 10-18 at 23-48) However, Evans did not receive more invasive treatments for these conditions, and he declined orthopedic surgical management. (D.I. 10-17 at 8, 13, 16, 58, 66) Evans took Percocet to manage the pain associated with these conditions, and he consistently confirmed that the medication did not interfere with his ability to function. (*Id.* at 3, 8, 34, 40, 46, 50) By August 2014, Dr. Glassman noted his plan to taper down Evans' Percocet intake. (*Id.* at 6)

The medical evidence of record does not establish that Evans' restricted range of motion in his neck and back affected his ability to perform work. In fact, most examinations suggested that Evans had a normal range of motion in his cervical and thoracic spine. (D.I. 10-17 at 5, 10, 36, 57, 61) In February and March of 2014, Evans' treatment records reflected a normal or functional range of motion in his lumbosacral spine as well. (*Id.* at 42, 48) Evans exhibited an improved range of motion and reduced pain in these conditions with continued treatment. (*Id.* at 6) The ALJ accounted for the limitations asserted by Evans by imposing postural limitations and restrictions on lifting and climbing ladders, ropes, and scaffolds. (D.I. 10-2 at 26)

The ALJ also considered an MRI from November 2013 showing a partial thickness bursal surface tear in the supraspinatus tendon of Evans' right shoulder, which supported findings of Evans' mildly limited range of motion in the right shoulder. (D.I. 10-2 at 26; D.I. 10-14 at 36; D.I. 10-17 at 5) The record reflects that Evans received injections in his shoulder, which were effective in reducing his pain and increasing his range of motion. (D.I. 10-17 at 34, 46) Dr. Townsend reported that Evans had a full range of motion in the right shoulder in March 2014. (D.I. 10-14 at 48) In August 2014, Dr. Glassman concluded that Evans had only a mild limitation in the range of motion of his right shoulder with no signs of impingement. (D.I. 10-17 at 5) The record reflects that Evans described pain with overhead reaching and decreased range of motion as a result of his right shoulder injury. (D.I. 10-2 at Tr. 56; D.I. 10-17 at 8) The ALJ accounted for the limitations asserted by Evans by imposing postural limitations and restrictions on lifting and climbing ladders, ropes, and scaffolds. (D.I. 10-2 at 26)

The ALJ's finding that Evans' right carpal tunnel syndrome was not severe is also supported by the evidence of record. Multiple EMG tests revealed that Evans' carpal tunnel syndrome was mild. (D.I. 10-14 at 53-54, 57-58) Dr. Glassman's records demonstrate that

17

Evans maintained a full range of motion in his right hand. (D.I. 10-17 at 5, 10, 15, 20, 25, 36, 42, 48, 52, 57, 61, 65) Evans used night splints for symptomatic relief of his carpal tunnel syndrome, but did not undergo additional treatment for the condition. (D.I. 10-14 at 48) Evans declined to pursue surgical intervention for his carpal tunnel syndrome or his right shoulder injury. (D.I. 10-17 at 8, 11, 16, 58, 63, 66) Treatment records therefore support the ALJ's conclusion that "the claimant has full range of motion in his right hand and intact sensation." (D.I. 10-2 at 26)

Moreover, the ALJ considered Evans' right hand contracture, but noted that the contracture was not severe enough to warrant surgery. (D.I. 10-2 at 30) The ALJ's findings on this point are supported by the medical evidence of record. Specifically, Dr. Townsend observed that "[a]t some point, we may elect to go forward with surgical correction" of Evans' Dupuytren's contracture. (D.I. 10-14 at 48) In his opinion, Dr. Glassman concluded that Evans had no limitation using his right hand, and the ALJ gave this finding significant weight. (D.I. 10-18 at 52) For these reasons, the evidence of record supports the ALJ's finding that these impairments were not severe. (D.I. 10-2 at 26)

## 2. Residual functional capacity

Evans also contends that the ALJ erred in determining his RFC by failing to account for Evans' use of a cane for walking and balance. (D.I. 15 at 16) An RFC establishes the most an individual can do in a work setting despite impairments and limitations. 20 C.F.R. §§ 404.1545, 416.945. In making this finding, the ALJ must consider all of the claimant's impairments, including those that are not severe. Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. *See Plummer*, 186 F.3d at 429. Notwithstanding the fact that all evidence in the

18

record must be considered, the ALJ has the exclusive responsibility for determining an individual's RFC. 20 C.F.R. § 404.1527(d)(2).

Substantial evidence supports the ALJ's RFC determination in the present case. The ALJ explained that, "after his cane was prescribed in August 2013 for balance issues, there is little mention of balance problems in VA or pain management records. There are also no objective test results on the claimant's lower extremities since his amended alleged onset date."[5] (D.I. 10-2 at 31) The record supports this conclusion. Evans' treatment records show that he used a cane from August 2013 to February 2014. (D.I. 10-17 at 48, 53, 58, 62-63, 69, 75; D.I. 10-18 at 6, 11) However, as of March 2014, the treatment records describe Evans' gait as normal and do not indicate that he used a cane. (D.I. 10-17 at 5, 10, 15, 21, 25, 37, 42) Evans' use of the cane therefore fails to satisfy the twelve month durational requirement set forth in 20 C.F.R. §§ 404.1509 and 416.909. *See Doherty v. Comm'r of Soc. Sec.*, 2012 WL 4507831, at *12 (D.N.J. Sept. 28, 2012) (concluding that the ALJ did not err in failing to address the plaintiff's use of a cane in the hypothetical posed to the vocational expert because the plaintiff did not use the cane for the entire time period at issue); *see also Shoup v. Comm'r of Soc. Sec.*, 2017 WL 2240511, at *4 (W.D. Mich. May 23, 2017) (concluding that the ALJ did not err in failing to include a limitation for the use of a cane because the plaintiff's use of a cane was temporary and the medical evidence established that the plaintiff no longer required the use of the cane).[6] The ALJ

---

[5] The ALJ indicated that postural limitations in the RFC assessment "address [Evans'] neck and back pain, his shoulder impairment, and his need for a cane due to balance issues and pain from his alcoholic neuropathy, as will the limitation for no exposure to hazards." (D.I. 10-2 at 31)

[6] In support of his position, Evans relies on *Graver v. Colvin*, 2014 WL 1746976 (M.D. Pa. May 1, 2014), in which the court determined that the ALJ erred in failing to account for the plaintiff's use of a cane to walk and stand when posing the hypothetical question to the vocational expert. The facts before the court in *Graver* are distinguishable from the circumstances presently before the court. In *Graver*, the plaintiff's testimony, the ALJ's observations, and medical evidence of record from the plaintiff's physical therapists and treating physicians established that the plaintiff

19

was not required to credit Dr. Glassman's opinion in his medical source statement or Evans' hearing testimony when Dr. Glassman's own treatment notes contradicted that evidence. (D.I. 10-2 at 51-52; D.I. 10-17 at 5; D.I. 10-18 at 52)

It is the ALJ's responsibility to make an RFC determination based on the medical evidence. 20 C.F.R. §§ 404.1527(e)(2), 404.1546(c). Here, substantial evidence supports the ALJ's RFC determination that Evans could perform light work.

### 3. Opinions of Evans' treating physician

Evans argues that the ALJ failed to properly weigh the medical opinion of his treating physician, Dr. Glassman. (D.I. 15 at 18-20) Evans claims that the ALJ improperly gave Dr. Glassman's opinion little weight, despite his extensive treatment history with Evans. (*Id.*)

To determine the proper weight to give a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). Generally, the weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4). To that end, the more consistent an opinion is with the record as a whole, the more weight is given to that opinion. *Id.* at §§ 404.1527(c)(4), 416.927(c)(4).

The ALJ must first assess whether a medical opinion is from a treating, non-treating, or non-examining source. 20 C.F.R. §§ 404.1502, 416.902; *see also Fletcher v. Colvin*, 2015 WL 602852, at *9 (D. Del. Feb. 11, 2015), *report and recommendation adopted*, 2015 WL 1284391 (D. Del. Mar. 19, 2015). The opinion of a treating physician who has an "ongoing treatment

---

continued to require the use of a cane. *Id.* at *4-6. In contrast, the medical evidence presently before the court indicates that Evans did not use a cane after February 2014. (D.I. 10-17 at 5, 10, 15, 21, 25, 37, 42)

relationship" with the patient is entitled to special significance. 20 C.F.R. § 404.1502; *Fargnoli*, 247 F.3d at 43 (citing 20 C.F.R. § 404.1527(d)(2)). On the other hand, a treating physician's opinion does not warrant controlling weight if it is unsupported by clinical and laboratory findings, and if it is inconsistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Fargnoli*, 247 F.3d at 42-43. The more a treating source presents medical signs and laboratory findings to support the medical opinion, the more weight it is given. *See Robinson*, 137 F. Supp. 3d at 644. Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.*

An ALJ may not reject a treating physician's assessment based on his or her own credibility judgments, speculation, or lay opinion, and the ALJ cannot disregard a treating physician's opinion without explaining his or her reasoning or referencing objective conflicting medical evidence. *Morales*, 225 F.3d at 317; *Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986). Even when the treating source opinion is not afforded controlling weight, the ALJ must determine how much weight to assign it by considering factors such as length, nature, and frequency of treatment visits, nature and extent of the treatment relationship, whether the opinion is supported by medical evidence, whether the opinion is consistent with the medical record, and the medical source's specialization. 20 C.F.R. §§ 404.1527(d), 416.927(d).

In the present case, the ALJ did not err in evaluating Dr. Glassman's opinion. The ALJ considered the record as a whole and found that Dr. Glassman's opinion was not well supported by the objective medical findings. (D.I. 10-2 at 31-32) The ALJ recognized Dr. Glassman as a treating physician, but he observed that the exertional and postural limitations found by Dr. Glassman were not supported by Dr. Glassman's own treatment records. (D.I. 10-2 at 32)

21

Dr. Glassman's treatment records reflect occasional limitations in Evans' range of motion in his spine, a mild limitation in the range of motion in his shoulder, and no limitation in using his hands. (D.I. 10-17 at 5-6, 10, 15, 18, 20, 25-26, 36, 42, 48, 52, 57, 61, 65) The treatment notes do not contain recommended restrictions on Evans' physical activity or ability to work, and a number of his more recent treatment notes indicate that Evans walked with a normal gait. (*Id.* at 5, 10, 15, 21, 25, 37, 42) Dr. Glassman noted improvement in Evans' condition with conservative treatments such as physical therapy and osteopathic manipulation, and recommended tapering down Evans' use of Percocet by August 2014. (*Id.* at 5-6, 18, 26) The ALJ noted that Dr. Glassman did not refer Evans to a surgeon or neurologist, nor did he order follow-up testing on Evans' neck, low back, or legs. (D.I. 10-2 at 32)

These treatment records are consistent with other substantial evidence of record, which shows that Evans' shoulder pain improved with injections, and his cervical and thoracic pain improved with heat packs and osteopathic manipulation. (D.I. 10-17 at 6) EMG testing confirmed that Evans' carpal tunnel syndrome was mild, and he had no cervical radiculopathy. (D.I. 10-14 at 48, 53-54) Dr. Glassman's treatment notes and the objective medical test results do not support a finding that Evans could only sit for two to four hours, and stand or walk for less than two hours, in an eight-hour workday; rarely lift ten pounds; rarely twist or stoop; and reach overhead with his right arm for 50% of the day. (D.I. 10-18 at 51)

As previously discussed at § IV.B.2, *supra*, Dr. Glassman's treatment records and the other evidence of record do not support Dr. Glassman's opinion that Evans requires the use of a cane, or that Evans must keep his legs elevated at waist level when sitting. (D.I. 10-18 at 51-52) Dr. Glassman's treatment records between March 2014 and August 2014 make no mention of a cane, and they indicate that Evans walked with a normal gait despite decreased sensation in his

22

lower extremities. (D.I. 10-17 at 5, 10, 15, 21, 25, 37, 42) Therefore, the ALJ did not err in failing to give controlling weight to the opinion of Dr. Glassman.

## V. CONCLUSION

For the foregoing reasons, I recommend that the court deny Evans' motion for summary judgment (D.I. 14), and grant the Commissioner's cross-motion for summary judgment (D.I. 17).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: February 12, 2019

Sherry R. Fallon
United States Magistrate Judge

23